STAFFORD-LOWDON CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9088. Promulgated August 22, 1927.

Actual cash value of property paid in for capital stock determined.

*Charles Kassel, Esq.*, for the petitioner.
*Shelby S. Faulkner, Esq.*, for the respondent.

This proceeding results from the determination of deficiencies for the years 1920 and 1921 by the respondent, aggregating $11,460.50. Petitioner avers error was committed with reference to but one issue—the value of assets paid in for capital stock on December 10, 1915, was $225,273.39 and not $88,159.03, as allowed by respondent, and the invested capital allowed by respondent for 1920 and 1921 is understated in consequence.

FINDINGS OF FACT.

Petitioner is a Texas corporation with its principal office at Fort Worth, Tex., and is engaged in the business of printing and lithographing.

In March, 1911, a corporation, the Exline-Reimers Co., was organized for the purpose of merging two predecessors; the Exline Co. and the Reimers Co. The Exline Co. owned a lithographing plant and the Reimers Co. a printing plant so that the Exline-Reimers Co. combined the business of lithographing and printing. All work thereafter was performed at Fort Worth, but a store was maintained at Dallas. In connection with the organization of the Exline-Reimers Co. the lithographing presses secured from its predecessors were sold and new machinery acquired. Replacements were also made of other machinery. By 1913 most of the machinery then on hand was new and had been purchased in 1911 or 1912. No secondhand machinery was purchased. In 1913 an appraisal of the assets was made by appraisal engineers, and the machinery, equipment and furniture and fixtures were revalued on the books under date of March 28, 1913, at the appraised values. These values were based upon original cost with adjustment for depreciation, and were less than the previous book values. In a report to the board of directors on March 28, 1913, the president of the Exline-Reimers Co. made the following statements:

\* \* \* Machinery, two hundred and fourteen thousand five hundred and seventy-seven dollars and five cents ($214,577.05). This represents to us the

actual amount at which this machinery is carried and from which depreciation has been charged off from time to time. This machinery, together with the engravings, lithotypes and the like, could not be developed now for two hundred and seventy-five thousand ($275,000) dollars. The machinery in this plant is practically all new, up to date, and is of the very latest style models and patterns, and there is not in our entire establishment a piece of machinery which is out of date or one which is not actually in use in our plant. Practically every machine in the plant is individually motor driven.

Furniture and fixtures fifteen thousand nine hundred and sixty-two dollars and twenty cents ($15.962.20). This amount represents the actual cost to us of the furniture and fixtures comprising various and sundry articles and furniture used by us in our general office in our plant and in our two retail stores and is comprised of office equipment, filing cases, cabinets, adding machines, typewriters, plant and retail stores, shelving, lighting fixtures, warehouse and plant working tables, and so forth. This includes six thousand ($6.000) dollars for plant sprinkler equipment which gave us a reduction of practically one hundred percent (100%) in our insurance rates.

The creditors of the Exline-Reimers Co. met in July, 1915, to consider the financial condition of the company. Thereafter a communication was issued in printed form to the creditors, the material portions of which were as follows:

It appears that there are first mortgage bonds amounting to $50,000, dated July 1, 1912, but not executed and registered until March 20, 1913, which cover the entire plant. Whether they cover any of the merchandise, raw material and bills and accounts receivable is a matter of dispute. These bonds bear interest at the rate of seven percent, payable semi-annually. Interest to the amount of over $7,000 is in default, and foreclosure proceedings have been begun. These bonds are owned as follows:

Mrs. M. A. Reimers, mother of C. D. Reimers, $35,000; J. W. Mitchell, a director of the company, $6,000; C. D. Reimers, president of the company, $3,000; M. P. Exline, vice-president of the company, $5,000; John Philip, $1,000.

It appears that a second mortgage covering the same property as the first mortgage was executed December 8, 1913, and registered February 21, 1914, to secure C. D. Reimers, M. P. Exline and Thad N. Collier against their liability as sureties on indebtedness of the company. It is said that the indebtedness of the company upon which these gentlemen are liable as sureties amounts to approximately $72,000, of which about $50,000 is owing to banks, about $10.000 to Mrs. M. A. Reimers, and about $6,000 each to C. D. Reimers and M. P. Exline. The validity of this second mortgage is a matter of dispute.

The balance sheet shows bills payable for machinery to the amount of $10,503.45. These bills are said to be secured by chattel mortgages given for purchase money, which mortgages doubtless constitute liens upon specific items of property superior to the lien of the first mortgage.

Taxes are delinquent to the extent of $4,367.87, as shown by the balance sheet.

In addition there are unsecured accounts and bills payable to the amount of something more than $50,000. The largest unsecured creditor is Graham Paper Company, which has a claim of nearly $21,000.

The general feeling of the creditors present, based upon the information then at hand, was that the company had a well equipped plant, and was

capable of handling a large business at a good profit, but had not been able for a year or more to obtain business enough to keep its plant advantageously employed, and had been operating at a disproportionately heavy expense. It was evident to the creditors assembled that a forced liquidation would result in a very great shrinkage of assets, and in their being found insufficient to pay any substantial amount to the second mortgage and unsecured creditors. It was thought probable, however, that if preserved and properly managed the business might be made to yield very much better results, and possibly to pay the debts in full.

The assembled creditors unanimously voted to request the board of directors to appoint a committee which should take charge of the business until October 1, 1915, * * *. It was agreed that the current business should be transacted upon a cash basis * * *. It was agreed that it should be the duty of this committee * * * to report to the creditors by October 1, 1915, its conclusions and recommendations. It was agreed that the bondholders should postpone until after October 1, 1915, all further action in their foreclosure suit and that the creditors represented should abstain from pressing their claims.

In December, 1915, the Exline-Reimers Co. became bankrupt and its affairs were placed in the hands of a trustee. Members of the Reimers family held $35,000 par value of the outstanding bonds, $12,000 or $15,000 par value of the preferred stock, and $50,000 or $60,000 par value of the common stock. The company was indebted to Mrs. M. A. Reimers, mother of the president, for $10,000, and to the president, C. D. Reimers, for $5,000. Reimers and Exline were endorsers of the company's notes payable held by local banks. The owner of the building leased by the Exline-Reimers Co. was the father-in-law of the president of the bankrupt company. The company leased the building it occupied on very favorable terms, paying the taxes and insurance and 7½ per cent on the investment, at-cost. The lessor notified the creditors' committee not to sell or remove from the building any part of the plant and equipment. The company was indebted to the lessor for rent and by reason of the default the lessor had the right to terminate the lease. The lessor's proof of claim, filed on December 9, 1915, in the bankruptcy proceedings of the Exline-Reimers Co., aggregated $9,524.75, and included November and December rent, $1,054.48, state, county and city taxes on the building, and fire insurance. The lease provided in part:

The consideration that the lease is to continue twenty years commencing at the date of the completion of the improvements, the lessee paying seven and one-half (7½%) per cent on the total value of the lands and improvements, they being twenty-five thousand ($25,000) dollars for the lands and the actual cost of the improvements when ascertained, and also taxes, assessments and charges including those for paving, curbing and sidewalks on any exposure of said improvements made or based against or on the premises during the term of the lease, and fire and tornado insurance premiums; the amount of insurance to be not less than three-fourths (¾) of the value of the improvements. And

the provision that if any of the monthly installments of rent or any portion thereof remain unpaid for thirty days after due date, or if the lease be defaulted in payment of any tax assessments or charges for thirty days, or failure to pay insurance premiums promptly, or if the lessee's interest shall be taken under execution or other legal process, or if the lessee shall become bankrupt, the lessor shall have the right to re-enter and the lease shall become void.

To remove the assets and set them up in another building would have cost at least $10,000. The building was equipped for the special needs of the Exline-Reimers Co. Prospective bidders other than members of the Reimers family for the plant and equipment of the Exline-Reimers Co. were not assured of a renewal of the lease on the building occupied by the company.

An endeavor was made by the trustee to realize on the assets of the bankrupt by advertising for bids. Mrs. M. A. Reimers made a proposition to purchase the assets and it was accepted on December 9, 1915, by order materially as follows:

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS, AT FORT WORTH.

| In the Matter of | No. 860 |
| The Exline-Reimers Company, | In Bankruptcy. |
| Bankrupt. | |

Considering the application for order of sale filed herein the 22nd., day of November, 1915 by Trustee for the above named, The Exline-Reimers Company, Bankrupt, J. D. Collett, and it appearing to the Court that due and legal notice has been given all known creditors and parties in interest upon said application for order·of sale;

And at creditors meeting held in response to said notice and in conformity therewith, at the office of the undersigned Referee in Bankruptcy in Fort Worth, Texas, on the 3rd., day of December, A. D. 1915, the said application for order of sale was submitted to the said meeting of creditors, duly considered and discussed and thereupon Mrs. M. A. Reimers, in open Court and as part of the proceedings of said meeting, made an offer for every and all the assets of the bankrupt, other than cash, being the amount which should fully discharge what is known as the first mortgage bonds, which should pay all expenses and priorities in full and which should pay to all unsecured creditors, twenty-five cents on the dollar, cash, as claims should be, by the Court, filed and allowed, conditioned, however, that the notes and obligations of the bankrupt known and described as those secured by the second mortgage against the assets and properties of the bankrupt, should be waived as claims against the estate and against the bankrupt, and insofar as these proceedings are concerned, should be in all things for naught held, the exact amount of said offer to be fixed and determined by the Court in order to obtain the net result as offered.

The said offer was submitted to the creditors and after discussion and consideration, it was, by a unanimous vote of creditors present or represented,

which included a majority in number and amount of the unsecured creditors of the bankrupt, accepted.

Thereupon, it was, by the Referee as a part of the proceedings of said creditor's meeting, announced that the offer of Mrs. M. A. Reimers would be accepted and approved by the Court, and that upon the determination of the amount required to make the said offer effective and upon payment thereof to the Trustee, the Trustee, J. D. Collett, would be ordered and directed to deliver to the said Mrs. M. A. Reimers, all and singular the assets of the bankrupt, free of liens.

Subsequent thereto and upon this, the 9th day of December, 1915, there having been offered and filed in this Court in due form, proofs of claims representing all and singular the first mortgage bonds of the bankrupt, now all in the name of Mrs. M. A. Reimers, and the beneficiaries under, and the owners and holders of all and singular the obligations of the bankrupt, secured by what is known and denominated as the second mortgage, having presented their notes, the same being obligations of the bankrupt, and said notes having been marked filed, and each and all of the aforementioned owners and holders of said notes and beneficiaries under said second mortgage having filed their respective waivers herein, in substance that they did not and will not assert claim against the bankrupt in this proceeding, and did not and will not assert a lien or charge of any character against the assets of the bankrupt under or by virtue of said second mortgage; and it appearing that with the cash on hand in the possession of the Trustee, it will require a payment to the Trustee of the sum of $13,430.00 to pay off and make effective the offer of Mrs. M. A. Reimers, under the sale approved at creditors' meeting held as aforesaid; and Mrs. M. A. Reimers having now paid to the Trustee, J. D. Collett, the sum of $13,430.00, it is, by the Court, ordered, adjudged and decreed that the sale of all and singular the assets of the bankrupt, as the same existed at the close of business on the 8th day of December, 1915, to Mrs. M. A. Reimers shall be, and the same hereby is, in all things approved and confirmed, and the property so sold being that described in the Trustee's application for order of sale, consisting of the plant, machinery, fixtures, equipment, merchandise, accounts, demands, bills receivable, contracts, easements, lease contracts, franchises, and in fact, each, all and every right, privilege, estate and effect heretofore owned by, belonging to, owing or due the above named, The Exline-Reimers Company, the bankrupt, and which shall include accounts and demands created and incident to the operation of the said plant under the receivership first, of W. G. Newby and subsequent thereto to the receivership of J. D. Collett, and the Trusteeship of J. D. Collett, as the same existed at the close of business the 8th day of December, 1915.

The following balance sheet reflects the books of the company on the date of the sale:

THE EXLINE-REIMERS CO.

*Balance Sheet of December 9, 1915.*

| Assets. | | Liabilities. | |
|---|---|---|---|
| Cash | $6, 692. 85 | Capital stock | $254, 200. 00 |
| Live stock | 300. 00 | Preferred stock | 25, 000. 00 |
| County warrants | 2, 183. 14 | Bills payable | 75, 133. 74 |
| Bills receivable | 3, 327. 09 | Reimers foundry | 999. 51 |
| Suspense and engraving | 1, 000. 00 | Bonds | 50, 000. 00 |
| Suspense | 316. 80 | Accounts payable | 58, 887. 38 |
| Profit and loss | 101, 928. 01 | | |
| Machinery and furniture and fixtures | 250, 303. 76 | | |
| Salesmen's merchandise | 146. 96 | | |
| Security National Bank | 4, 844. 95 | | |
| Accounts receivable | . 47, 568. 39 | | |
| Merchandise inventory | 45, 608. 68 | | |
| | 464, 220. 63 | | 464, 220. 63 |

The accounts on the books of the bankrupt corporation showed assets as follows:

| | Appraised value in 1913 | Additions | | | Deprecia- tion | Net Balance |
|---|---|---|---|---|---|---|
| | | 1913 | 1914 | 1915 | | |
| Lithographing room | $22, 742. 94 | $76. 97 | | | | } $83, 797. 39 |
| Engravings | 53, 351. 91 | | $5, 956. 07 | $4, 169. 50 | $2, 500. 00 | |
| Electro room | 4, 020. 00 | 7. 50 | | | | 4, 027. 50 |
| Stock room | 2, 329. 54 | | | | | 2, 329. 54 |
| Binding and ruling room | 21, 036. 41 | 1, 141. 47 | 592. 21 | 169. 68 | 500. 00 | 22, 439. 77 |
| Machinery room | 3, 549. 25 | 16. 50 | | | | 3, 565. 75 |
| Embossing room | 10, 517. 98 | | 37. 91 | | | 10, 555. 89 |
| Printing room | 76, 061. 38 | 3, 372. 80 | 8, 408. 32 | 703. 93 | 4, 000. 00 | 84, 546. 43 |
| Transfer room | 5, 877. 14 | 76. 22 | | | | } 21, 023. 86 |
| Plates | 15, 070. 50 | | | | | |
| Office and building | 13, 983. 03 | 364. 66 | 1, 043. 20 | [1] 171. 75 | | 15, 219. 14 |
| Shipping room | 560. 62 | 11. 00 | | | | 571. 62 |
| Dallas store | 2, 391. 70 | 58. 21 | | [1] 223. 25 | | 2, 226. 66 |
| | 231, 492. 40 | 5, 125. 33 | 16, 037. 71 | 4, 648. 11 | 7, 000. 00 | 250, 303. 55 |

[1] Credit.

SUMMARY

| | |
|---|---|
| Miscellaneous assets | $193, 826. 07 |
| Less depreciation | 7, 000. 00 |
| | 186, 826. 07 |
| Engravings | 63, 477. 48 |
| | 250, 303. 55 |

On December 10, 1915, a new corporation, the Reimers Co., was formed for the purpose of taking over the assets from Mrs. M. A. Reimers in exchange for its capital stock, and operating the business.

Application for a charter was immediately filed and incorporation was completed without delay. The stockholders of the new corporation were the members of the Reimers family who were previously stockholders of the bankrupt company. Purely as a matter of convenience and without reference to the actual cash value of the assets paid in, the capital stock was designated and issued at a total par value of $100,000, which was considered to be the aggregate of the new capital Mrs. Reimers had supplied. Machinery, equipment, furniture and fixtures were set up on the books at a value of $88,159.03. Other assets were set up and also liabilities, and the nominal net worth required the booking of a paid-in surplus amounting to $43,359.08. A balance sheet drawn from the books immediately after opening was as follows:

THE REIMERS COMPANY.

Balance Sheet of December 10, 1915.

| Assets. | | Liabilities. | |
|---|---|---|---|
| Accounts receivable | $40,227.03 | Bills payable | $39,680.07 |
| Cash | 5,000.00 | Capital stock | 100,000.00 |
| Bills receivable | 1,099.87 | Surplus | 43,359.08 |
| Merchandise inventory | 45,608.68 | | |
| Prepaid insurance | 761.40 | | |
| County warrants | 2,183.14 | | |
| Machinery, furniture and fixtures | 88,159.03 | | |
| | 183,039.15 | | 183,039.15 |

Included in the equipment acquired by the Reimers Co. were at least 1,000 stones used in lithographing, which are called "engraving stones." Their surfaces on both flat sides contain a number of engravings acquired over the years of operation and the stones are indexed and filed for ready access in event of the receipt of orders making use of the engravings. The stones are valuable through the saving in cost effected and because of the probability of repeat orders from the customer. The stones are not subject to physical depreciation and they may be used repeatedly through the substitution of new engravings after grinding off the shallow surface containing the engraving no longer desired. Engraving stones were capitalized on the books of the bankrupt corporation in December, 1915, at $63,477.48.

The value of the machinery, equipment, furniture, and fixtures paid in for capital stock in 1915 was at least $168,143.66 and the value of the engraving stones was at least $31,738.74.

The charter of the Reimers Co. was amended in 1919 and the name changed to Stafford-Lowdon Co.

OPINION.

MILLIKEN: The parties are in agreement that tangible property paid in for capital stock in 1915 should be valued for invested capital purposes at its actual cash value when paid in, but they are in disagreement as to the amount of the actual cash value, thus presenting a question purely of fact for determination. The circumstances which lead up to the organization of the petitioner are detailed in the findings of fact. The respondent has held that the actual cash value of the tangible property under consideration was no more than the amount of $88,159.03, at which it was entered in 1915 on petitioner's books. Respondent attaches significance to the entry, but we are satisfied that no attempt was made to set up the real values. Respondent mainly relies on the bankruptcy of the Exline-Reimers Co. and the fact that the unsecured creditors accepted 25 cents on the dollar in settlement of their claims, as indicative of the fact that the tangible property did not have an actual cash value in excess of the amount determined by him. The respondent offered no evidence of value other than that afforded by entries on the books of the bankrupt and of the petitioner. The amount of value claimed by the petitioner is the aggregate shown by the books of the bankrupt, $250,303.55, less 10 per cent for depreciation in 1915—$25,030.16, leaving a value claimed, amounting to $225,273.39. There is a discrepancy of a few cents unaccounted for.

A large amount of evidence was adduced relative to the value of the engraving stones which were purchased from the bankrupt and paid in to the petitioner for capital stock. We are satisfied of the importance of these assets to the going concern and that their value is generally recognized in the industry. It is in evidence that 50 per cent of the stones are of current value and use, and one-half of the total cost of all of the stones is their value, and they are not subject to physical depreciation.

No doubt the financial condition of the Exline-Reimers Co. is evidence of value and lends plausibility to the determination of the respondent, but the testimony of record given by witnesses competent to testify as to the value of the tangible property when acquired by petitioner leads to the conclusion that the machinery and equipment had an actual cash value when acquired of $168,143.66. The engraving stones had an actual cash value of $31,738.74. Cf. *Appeal of The Markenheim Co.*, 1 B. T. A. 1240; *Appeal of Pittsburgh Grinding Wheel Co.*, 2 B. T. A. 712; and *Appeal of Plymouth Coal Mining Co.*, 3 B. T. A. 1023.

In determining earned surplus for invested capital purposes for the years in question the machinery and equipment of the actual cash value of $168,143.66 should be depreciated at the rate of 10 per cent per annum from 1916 to 1920.

> *Judgment will be entered upon 15 days' notice, under Rule 50.*

Considered by MARQUETTE, PHILLIPS, and VAN FOSSAN.